**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

LEE W. MURBERG,

                 Plaintiff,

vs.                          Case No. 8:08-cv-936-T-17JRK

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                 Defendant.

_____/

## REPORT AND RECOMMENDATION[1]

## I. Status

Lee W. Murberg ("Plaintiff") is appealing the Commissioner of the Social Security Administration's final decision denying his claim for disability insurance benefits and supplemental security income. His alleged inability to work is based on physical impairments involving his knees and back. See Transcript of Administrative Proceedings ("Tr.") at 70; Memorandum of Law (Doc. No. 14; "Pl.'s Mem.") at 9-10. In addition to the physical impairments, Plaintiff alleges he suffers from the mental impairment of major depressive disorder. See Pl.'s Mem. at 2. Plaintiff applied for disability insurance benefits and supplemental security income on November 18, 2003. Tr. at 61-63. After holding a hearing on January 17, 2007, the Administrative Law Judge ("ALJ") issued a decision on February 1, 2007 finding Plaintiff was not disabled through the date of the decision. Tr. at 12-33. On

---

[1]  Specific, written objections may be filed in accordance with 28 U.S.C. § 636 and Rule 6.02, Local Rules, United States District Court, Middle District of Florida ("Local Rule(s)"), within ten (10) days after service of this document. Failure to file timely objections shall bar the party from a de novo determination by a district judge and from attacking the factual allegations on appeal.

March 12, 2008, the Appeals Council denied Plaintiff's request for review. Tr. at 7-9. On May 14, 2008, Plaintiff commenced this action under 42 U.S.C. § 405(g) by timely filing the Complaint (Doc. No. 1) seeking review of the Commissioner's final decision. Plaintiff has exhausted the available administrative remedies, and the case is properly before the Court.

Plaintiff raises three issues: (1) whether the ALJ incorrectly failed to consider the limiting effects of Plaintiff's mental impairment; (2) whether the ALJ improperly discredited Plaintiff's subjective testimony as to his pain and the side effects of his medication; and (3) whether the ALJ improperly discounted the opinions of Plaintiff's treating physicians. See Pl.'s Mem. at 2, 5, 6, 10, 13. For the reasons explained herein, the undersigned concludes that the ALJ correctly considered Plaintiff's mental impairment in determining his residual functional capacity; however, the ALJ did not provide adequate reasons for discrediting Plaintiff's subjective testimony as to his pain, and the ALJ's reasons for discounting the opinions of Plaintiff's treating physicians were not supported by substantial evidence. Therefore, it is recommended that the Commissioner's final decision be reversed and that this cause be remanded.

## II.  Background

Plaintiff was forty-eight years old at the time of the hearing before the ALJ. Tr. at 646. Plaintiff's past relevant work is in construction supplies sales, landscape construction, and resident training. Tr. at 71. He alleges he became unable to work because of disability beginning on July 30, 2000. Tr. at 61. Although the ALJ found Plaintiff was insured for disability benefits through December 31, 2005, he concluded Plaintiff was not disabled within the meaning of the Social Security Act. Tr. at 32-33.

## A. Medical History

On May 26, 1999 and June 1, 1999, Plaintiff was involved in accidents at work[2] while moving large rolls of carpet. Tr. at 180. It appears that Plaintiff injured his knee during the accidents, and that his back was also affected. In addition, Plaintiff suffered from problems with his elbow and arm. Plaintiff's physical impairments impacted him psychologically, resulting in major depressive disorder. Although these conditions occurred somewhat contemporaneously, for ease of description the medical evidence is discussed separately with respect to each of them.

### 1. Plaintiff's Knees

On June 17, 1999, Plaintiff went to Philip W. Christ, D.O. ("Dr. Christ") with complaints of pain in his left knee. Tr. at 336. According to Dr. Christ's medical notes, Plaintiff had been to the Largo Medical Center Emergency Room after being injured at work while lifting vinyl runners, boards, and carpet rolls. Tr. at 336. The physical examination by Dr. Christ revealed "mild effusion of the knee" with "tenderness over the medial and lateral parapetellar areas and marked tenderness over the medial joint line." Tr. at 336-37. X-rays showed "mild degenerative changes with no evidence of fracture or dislocation." Tr. at 337. Dr. Christ found that Plaintiff demonstrated "evidence of torn medial meniscus of the left knee and strain and sprain of the left knee." Tr. at 337. Dr. Christ recommended that Plaintiff continue taking Motrin, use an "immobilizer brace," and obtain an MRI of his knee. Tr. at 337. Dr. Christ permitted Plaintiff to return to light duty work, although he noted that Plaintiff would probably need arthroscopic surgery. Tr. at 337.

---

[2] At that time, Plaintiff worked at Scotty's hardware store. Tr. at 86.

On July 1, 1999, Plaintiff returned to Dr. Christ for a follow-up appointment for the "tear of the medial meniscus of the left knee with strain and sprain of the left knee." Tr. at 338. An MRI scan revealed "complete tear of the posterior horn of the medial meniscus." Tr. at 338. There was "mild lateral patellar subluxation and chondromalacia" and "subcutaneous nodes consistent with either subclavian or varicose veins in the popliteal area." Tr. at 338. Dr. Christ also noted "benign-appearing bone cysts in the proximal tibial metaphysis," and that "cruciate and collateral ligaments [were] intact." Tr. at 338. Dr. Christ discussed treatment options with Plaintiff and recommended "diagnostic and operative arthroscopy, possible arthrotomy of the left knee." Tr. at 338. Dr. Christ explained that Plaintiff would probably need "partial medial meniscectomy and lateral retinacular release and possible chondroplasty." Tr. at 338. Dr. Christ arranged for Plaintiff to have surgery. Tr. at 339. Plaintiff was allowed to continue "light duty" work. Tr. at 338.

On July 26, 1999, Dr. Christ performed "[d]iagnostic and operative arthroscopy of [Plaintiff's] left knee with partial medial meniscectomy"; "partial lateral meniscectomy"; "chondroplasty of the lateral femoral condyle"; and "lateral retinacular release." Tr. at 332-33. Dr. Christ's postoperative diagnosis was "tear of the posterior horn of the medial meniscus"; "patellofemoral malalignment"; "complex tear of the lateral meniscus and chondromalacia of the lateral femoral condyle." Tr. at 332. The postoperative plan was for Plaintiff to be prescribed a "patellar stabilizing brace." Tr. at 334. Plaintiff was given crutches and Vicodin. Tr. at 334.

After his knee surgery, Plaintiff was referred by Dr. Christ to Florida Spine Institute for physical therapy. Tr. at 483. Between August 12, 1999 and October 13, 1999, Plaintiff regularly received physical therapy for his knee at Florida Spine Institute. Tr. at 468-83.

On April 25, 2000, Plaintiff went to Sadhana Shah, M.D. ("Dr. Shah"), complaining of left knee pain. Tr. at 439.[3] Plaintiff indicated he believed the pain was related to his injury in May of 1999. Tr. at 439. According to Dr. Shah, ongoing pain in Plaintiff's knee led him to have another MRI, which showed that Plaintiff would need additional surgery. Tr. at 439. Plaintiff reported to Dr. Shah that he was in constant pain, although he was still working. Tr. at 439.

On June 13, 2000, Plaintiff returned to Dr. Christ for follow-up on his left knee pain, as well as pain in his right knee. Tr. at 316. Plaintiff's work required him to kneel, which aggravated his condition. Tr. at 316. Plaintiff's right knee was "popping," and there was swelling in both knees. Tr. at 316. Plaintiff had been scheduled for surgery, but it was cancelled due to his hypertension. Tr. at 316. Dr. Christ's physical examination revealed "a guarded type gait," "mild crepitance," and "tenderness, especially over the anteromedial aspect of the knee." Tr. at 316. X-rays of the right knee showed "mild-to-moderate degenerative changes." Tr. at 316. "There was probable contusion of the lateral collateral ligament and popliteal cyst which was asymptomatic and a probable bone cyst involving the posterior aspect of the proximal tibial metaphysis which was asymptomatic." Tr. at 316. Plaintiff desired "arthroscopic surgery of the left knee for diagnostic and operative

---

[3] Dr. Shah was Plaintiff's primary care physician and treated him for routine medical problems. Tr. 413-46, 432.

arthroscopy, possible arthrotomy of the left knee." Tr. at 316. At that time, Plaintiff also desired to keep working without restrictions. Tr. at 317.

On August 2, 2000, Dr. Christ performed "[a]rthroscopy of the left knee with partial medial meniscectomy"; "[p]artial lateral meniscectomy"; and "[c]hondroplasty of the patella." Tr. at 313-14. Dr. Christ's postoperative diagnosis was "[t]ear of the medial meniscus of the left knee with tear of the lateral meniscus left knee and chondromalacia patella." Tr. at 313. Plaintiff was given crutches and a brace, prescribed Darvocet, and instructed not to work for two weeks. Tr. at 314-15.

Plaintiff returned to Dr. Christ on August 31, 2000. Tr. at 311. Plaintiff had braces on his knees due to his chronic knee problems. Tr. at 311. Dr. Christ noted that Plaintiff was to start therapy for his knees by the end of that week. Tr. at 311. Plaintiff was not working due to his knee problems. Tr. at 312. Plaintiff also consulted Dr. Christ regarding lower back pain. Tr. at 311.[4] Physical examination revealed that Plaintiff was able to "ambulate unassisted with a marked guarded type of gait." Tr. at 311. "There [was] no sciatic notch tenderness and no tenderness about the trochanteric bursa or groin area or hips." Tr. at 311. An X-ray showed "mild degenerative changes with some anterior spurring especially of T12 and L1." Tr. at 312. "There [was] no spondylolisthesis, and the intervertebral disc spaces [were] satisfactory." Tr. at 312. Dr. Christ found that Plaintiff demonstrated "evidence of lumbosacral myositis and right sacroiliac strain." Tr. at 312. Dr. Christ noted that Plaintiff was obese and would benefit from weight loss. Tr. at 312. Plaintiff was given an injection of Dexamethasone. Tr. at 312.

---

[4] Although Plaintiff consulted Dr. Christ regarding his lower back pain, he received treatment for his back predominantly at Florida Spine Institute. See infra at 10-18.

On September 21, 2000, Plaintiff saw Dr. Christ for "follow-up of his lumbrosacral myositis with right sacroiliac strain." Tr. at 310. Physcial examination revealed "paravertebral muscle spasm and tenderness about the lumbrosacral spine with right sacroiliac tenderness." Tr. at 310. There was no "sciatic notch tenderness" or "tenderness over the trochanteric bursa." Tr. at 310. Dr. Christ referred Plaintiff to Florida Spine Institute for treatment of his back pain. Tr. at 533; see infra at 10-18.

On February 27, 2001, Plaintiff returned to Dr. Christ for his knees. Tr. at 309. Dr. Christ noted that Plaintiff was being treated at Florida Spine Institute for his back problems. Tr. at 309. Dr. Christ observed that most of Plaintiff's knee pain seemed to be over the medial parapatellar area of both knees, and he did "need to use the patellar stabilizing braces." Tr. at 309. Plaintiff's weight of 254 pounds made the potential benefits of additional surgery questionable. Tr. at 309. Dr. Christ opined that Plaintiff may eventually need knee replacements. Tr. at 309. Dr. Christ suggested anti-inflammatory medicines and glucosamine. Tr. at 309. Dr. Christ indicated that Plaintiff would have long-term limitations and should be restricted to "sedentary work only with limited walking and standing and he will not tolerate stairs or kneeling." Tr. at 309.

On April 2, 2001, Plaintiff saw Dr. Christ for a follow-up appointment on his knees. Tr. at 308. Plaintiff complained of pain in both knees, especially the left knee. Tr. at 308. Dr. Christ indicated Plaintiff had "chondromalacia patella especially over the lateral patellar area and even some pain superiorly here." Tr. at 308. Dr. Christ did not recommend further arthroscopic surgery, but indicated Plaintiff may eventually need a knee replacement, although Dr. Christ did not recommend a knee replacement for someone of Plaintiff's age and

weight.  Tr. at 308.  Plaintiff was given an injection of Dexamethasone and Xylocaine, and the need for future injections was indicated.  Tr. at 308.

Plaintiff continued to see Dr. Christ regularly for treatment of his knee pain.  Tr. at 285-307, 380.  Dr. Christ recommended against further surgery, but he left open the possibility of knee replacement surgery in the future.  Tr. at 298, 299.  Plaintiff was given injections of Dexamethasone and Xylocaine on most visits.  Tr. at 285-307, 380.  On July 2, 2001, Dr. Christ noted that Plaintiff had lost fifty-seven pounds since his previous visit.  Tr. at 307.  Dr. Christ indicated that Plaintiff would be "prone to having long term arthritic type pain and decreased use of the knees."  Tr. at 307.  On September 4, 2001, Plaintiff asked Dr. Christ about lifting weights, and Dr. Christ recommended against lifting weights, instead suggesting isometric knee exercises.  Tr. at 303.  Dr. Christ also suggested vocational training.  Tr. at 303

On April 11, 2002, Plaintiff saw William S. Maistrellis, M.D. ("Dr. Maistrellis") for complaints of "fullness in the left posterior distal thigh and proximal calf."  Tr. at 230, 234, 257.  Dr. Maistrellis observed "variscosities of the right anterior tibial region and large variscosities of the left popliteal fossa just above the knee joint."  Tr. at 231, 235, 258.  Dr. Maistrellis believed the variscosities "may be emanating from an incompetent saphenopopliteal junction."  Tr. at 231, 235, 258.

Also on April 11, 2002, Plaintiff saw Dr. Christ.  An MRI from March 20, 2002 showed that "the contusion of the lateral collateral ligament had resolved," "there was a considerable decrease in the amount of joint fluid," and the "bone cyst involving the proximal tibia [was] unchanged."  Tr. at 299.  The MRI did not show anything that Dr. Christ believed needed to

be treated with arthroscopic surgery. Tr. at 299. Dr. Christ explained that most of Plaintiff's pain seemed to be emanating from "the chondromalacia of the patella and in the parapatellar area." Tr. at 299. "For this, he should use the patellar stabilizing brace and the vascular surgeon [Dr. Maistrellis] has told him not to wear this." Tr. at 299. Dr. Christ "explained that this is a trade off." Tr. at 299.

On July 22, 2002, Dr. Christ recommended a series of Synvisc injections in both of Plaintiff's knees; the series of injections was completed on January 3, 2003. Tr. 292-97, 380. Plaintiff tolerated the Synvisc treatment well. Tr. at 292-97. Dr. Christ opined that Plaintiff would "benefit from retraining into some type of position where he was not on his feet so much." Tr. at 380.

On January 8, 2003, Dr. Maistrellis performed "[l]eft greater saphenous vein ligation and multiple phlebectomies" on Plaintiff. Tr. at 253. On April 30, 2003, Dr. Maistrellis performed "[r]ight greater saphenous vein ligation and multiple phlebectomies" on Plaintiff. Tr. at 248.

On September 2, 2003, an X-ray revealed moderate degenerative arthritis in Plaintiff's knees. Tr. at 288. Physical therapy involving heat and ultrasound, as well as range of motion and strengthening exercises, was recommended by Dr. Christ. Tr. at 288. Plaintiff was to attend these therapy sessions three times per week for four weeks. Tr. at 288.

On March 23, 2004, Plaintiff had a follow-up appointment with Dr. Christ for his knees. Tr. at 285. Fifteen days prior to this visit, Plaintiff had "twisted his knee and fell on it." Tr. at 285. Plaintiff had sprain and contusion of the left knee. Tr. at 285. Plaintiff was given an injection of Dexamethasone and Xylocaine. Tr. at 285.

### 2. Plaintiff's Back

On October 11, 2000, Plaintiff went to Florida Spine Institute and was seen by Robert D. Gruber, D.O. ("Dr. Gruber") for treatment of his back pain. Tr. at 533. He had been referred by Dr. Christ. Tr. at 533. The pain Plaintiff was experiencing was described as "sharp at times in the right side and low back region." Tr. at 533. Plaintiff indicated that he believed his most recent knee surgery "may have attributed to his low back discomfort, secondary to favoring his knee." Tr. at 533. Dr. Gruber identified "[a]cute right L5-S1 radiculitis secondary to small herniated nucleus pulposus at L5-S1"; "[d]egenerative disc disease at L4-L5"; and "[f]acet arthropathy." Tr. at 534. Dr. Gruber felt that "epidural steroid injection[s] should be done secondary to [Plaintiff's] history of radiculitis," and that Plaintiff should continue with physical therapy. Tr. at 534. Plaintiff received epidural steroid injections on October 13, 2000, October 24, 2000, and November 7, 2000. Tr. at 536-38.

On December 15, 2000, Plaintiff saw Paul Zak, M.D. ("Dr. Zak") for his right-sided lower back pain, as well as his right buttock and leg pain. Tr. at 539. The majority of Plaintiff's symptoms were in his lower back, and he also experienced intermittent tingling in both legs. Tr. at 539. Dr. Zak opined that Plaintiff had "[r]ight paracentral herniated nucleus pulposus at L5-S1 with right lower extremity radiculopathy"; "[f]acet joint syndrome"; "[d]egenerative disc disease L4-L5 and L5-S1." Tr. at 540. Dr. Zak explained that he believed Plaintiff's symptoms were related to two separate problems: his right-sided low back pain was likely due to facet arthropathy, which Dr. Gruber was to attempt to relieve with right-sided facet injections; and Plaintiff's radicular pain was thought to be secondary to the herniated disc at L5-S1, which could be helped by surgery, depending on the severity of the

symptoms. Tr. at 540. On December 29, 2000, Plaintiff received the right-sided facet joint injections. Tr. at 542-43. On January 9, 2001, Plaintiff returned to Dr. Zak. Tr. at 532. As Plaintiff reported "good relief with the facet joint injection," Dr. Zak recommended continuing with conservative treatment. Tr. at 532, 544.

On January 24, 2001, Plaintiff saw Ashraf Hanna, M.D. ("Dr. Hanna") for his lower back and right extremity pain. Tr. at 530-31, 546-47. Plaintiff had been referred to Dr. Hanna by Dr. Zak. Tr. at 530. Dr. Hanna indicated Plaintiff suffered from "[l]umbar radiculopathy with, interestingly, sympathetic component to his pain with positive hyperalgesia"; "[l]umbar facet joint disease"; and " lumbar disc herniation at L5-S1." Tr. at 531. Dr. Hanna opined that Plaintiff had two problems: one in the lower back, "possibly due to facet joint disease"; and the second one resulting from his nerve, "probably maybe due to nerve impingement, but that one is complicated by some sympathetic pain." Tr. at 531. Dr. Hanna recommended Neurontin and an anti-depressant, as well as lumbar facet joint injections. Tr. at 531. Plaintiff's allergies to vicodin and codeine were noted. Tr. at 530.

On February 6, 2001, in response to a "vocational rehab occupational status form," Dr. Gruber indicated that Plaintiff's treatment was ongoing, and his condition was expected to improve. Tr. at 529, 548. On February 13, 2001, Plaintiff returned to Dr. Zak after having undergone "facet blocks and medial branch blocks" with Dr. Hanna, and Plaintiff reported improvement. Tr. at 528, 550. In Dr. Zak's assessment, Plaintiff had "[l]umbar facet joint disease"; "[l]umbar disc herniation L5-S1"; and "[l]umbar radiculopathy." Tr. at 528, 550. Dr. Zak recommended continuing with conservative treatment, as Plaintiff was having some improvement and there was "no need to rush into any surgical procedure." Tr. at 528, 550.

On February 28, 2001, Plaintiff saw Dr. Hanna.  Tr. at 527, 551.  Plaintiff reported "only 10-15% improvement."  Tr. at 527, 551.  Dr. Hanna indicated Plaintiff had a "lumbar medial branch block with only 25% relief[,] and that was not going to make him a good candidate for radiofrequency ablation."  Tr. at 527, 551.  Dr. Hanna stated, "At this point, there is nothing else that I can offer besides some medication," and he referred Plaintiff back to Dr. Zak.  Tr. at 527, 551.

On April 10, 2001, Plaintiff returned to Dr. Zak.  Tr. at 526, 552.  Dr. Zak observed that Plaintiff had had "significant improvement with physical therapy and conservative care including medication management and injections" although he did continue to have chronic lower back pain and severe left knee pain.  Tr. at 526, 552.  Dr. Zak indicated Plaintiff suffered from "[d]egenerative disc disease, L3-L4, L4-L5, L5-S1 with chronic low back pain" and "[s]evere left knee pain, degenerative joint disease related."  Tr. at 526, 552.  Dr. Zak opined that "his chance for improvement with any back surgery to try to decrease back pain would give him no better than a 50-50 chance for improvement in that area."  Tr. at 526, 552.

On April 17, 2001, Plaintiff had an appointment with Dr. Gruber.  Tr. at 525.  Dr. Gruber stated, "At this point I do believe that I have done all I can from a conservative care perspective."  Tr. at 525.  Dr. Gruber indicated that "[f]uture treatment will likely be palliative in nature," and he recommended follow up with Dr. Hanna for long-term chronic pain management.  Tr. at 525.

On May 7, 2001, Plaintiff returned to Dr. Hanna.  Tr. at 524, 554.  Dr. Hanna stated that Plaintiff was "about 50% improved compared to what he was on my [last] evaluation."  Tr. at 524, 552.  Plaintiff reported that he was "able to do more activities and work."  Tr. at

524, 554.  The plan was for Plaintiff to "[c]ontinue on current management with the Celebrex, doxepin, Neurontin, and Ultram," as needed for pain.  Tr. at 524, 554.

On October 2, 2001, Plaintiff saw Dr. Hanna again.  Tr. at 523.  Plaintiff reported that his condition was essentially the same; that is, fifty percent improved overall.  Tr. at 523.  Dr. Hanna recommended continuing with the Celebrex, doxepin, Neurontin, and Ultram.  Tr. at 523.

Plaintiff returned to Dr. Hanna on April 24, 2002, August 26, 2002, and November 25, 2002.  Tr. at 520-22.  Dr. Hanna recommended continuing the treatment of Celebrex, doxepin, Neurontin, and Ultram.  Tr. at 520-22.

On March 7, 2003, Plaintiff saw Dr. Hanna again.  Tr. at 519.  Plaintiff complained of increased pain, although he reported that the Synvisc injections from Dr. Christ resulted in some improvement.  Tr. at 519.  Otherwise, Plaintiff's condition was essentially unchanged since his last visit.  Tr. at 519.  Dr. Hanna continued Plaintiff on temporary total disability, and the plan was to "do a caudal epidural steroid injection to see if he will get additional benefit," and to continue the home exercise program.  Tr. at 519.  A "transforaminal epidural steroid injection" was administered on April 15, 2003.  Tr. at 500 (capitalization omitted).

On September 24, 2003, Plaintiff had another appointment with Dr. Hanna.  Tr. at 518.  Plaintiff wanted to know "what he can possibly do to get better."  Tr. at 518.  Plaintiff reported that the caudal epidural steroid injection he received on August 26, 2003 "did not help much."  Tr. at 518.  Dr. Hanna planned to schedule an MRI of Plaintiff's lumbar spine, and Plaintiff was to continue his medication.  Tr. at 518.

On October 21, 2003, Plaintiff returned to Dr. Hanna to review the MRI of his lumbar spine. Tr. at 516. The MRI revealed "mild degenerative disk disease L1 to L2 and L4 to L5 as well as moderate degenerative disk disease at L5-S1 level along with fissure or tear and bulging posterior anulus," and "mild hypertrophy of the right L5-S1 facet joint." Tr. at 498, 516. There was no evidence of herniated nucleus pulposus or spinal stenosis. Tr. at 498. The plan was for Plaintiff to see Dr. Gruber for a "lumbar discogram" and to continue on his medical regimen of tramadol, Neurontin, and Paxil. Tr. at 516.

On November 19, 2003, Plaintiff saw Dr. Gruber, who stated that the lumbar discogram "demonstrated concordant diskogenic pain with gross annular tear at L4-L5, as well as concordant pain at L5-S1." Tr. at 515. Dr. Gruber recommended "minimally invasive nucleoplasty." Tr. at 515, 513, 512.

On January 12, 2004, Plaintiff underwent "[p]ercutaneous diskectomy L4-L5 and L5-S1 using left extra-pedicular," performed by Dr. Gruber. Tr. at 494. On January 26, 2004, Plaintiff returned to Dr. Gruber for a follow-up appointment. Tr. at 511. Plaintiff was essentially unchanged after the surgery. Tr. at 511. On January 27, 2004, Plaintiff saw Dr. Hanna and reported that he had "not done well" since the nucleopasty with Dr. Gruber. Tr. at 509. Plaintiff's work status remained at temporary total disability. Tr. at 509, 587.

On March 30, 2004, Plaintiff saw Dr. Gruber for follow up. Tr. at 508. Plaintiff reported little relief with the disk nucleoplasty. Tr. at 508. Plaintiff desired further operative intervention, but he was advised he would need to wait at least eight weeks before he could have additional surgery. Tr. at 508.

On April 7, 2004, Plaintiff saw Anthony Moreno, M.D. ("Dr. Moreno") upon the referral of Dr. Gruber. Tr. at 505. Dr. Moreno observed that Plaintiff had "really not completed the protocol for the nucleoplasty," so Plaintiff was returned to Dr. Gruber for continued conservative management. Tr. at 506. Dr. Moreno also recommended physical therapy. Tr. at 506. Dr. Moreno did not consider him a strong surgical candidate because of his weight. Tr. at 506-07.

On April 26, 2004, Plaintiff saw Dr. Hanna. Tr. at 504. Dr. Hanna continued Plaintiff's treatment plan. Tr. at 504. On April 30, 2004, Plaintiff saw Dr. Gruber, who noted Dr. Moreno's opinion. Tr. at 503. Plaintiff complained that the pain in his leg was keeping him up at night. Tr. at 503. Dr. Gruber's plan was to "[r]epeat lumbar epidural, anticipate right L5-S1 transforaminal approach." Tr. at 503. On May 18, 2004, Dr. Gruber indicated that the plan was to "await full realization of response to nucleoplasty." Tr. at 487. On June 8, 2004, Plaintiff's overall condition was unchanged, and he denied improvement since the last epidural. Tr. at 486. Dr. Gruber recommended that Plaintiff return to Dr. Moreno for possible surgical consultation, as all conservative measures had been exhausted. Tr. at 486.

On July 7, 2004, Dr. Moreno observed Plaintiff had lost twenty pounds since his last visit. Tr. at 485. Dr. Moreno recommended moving forward with an updated MRI of the lumbar spine and lumbar diskogram to consider additional surgery. Tr. at 485. A CT scan of Plaintiff's lumbar spine was conducted on August 2, 2004. Tr. at 565.[5]

On May 18, 2005, Dr. Hanna's notes reflect that Plaintiff was suffering from "[l]umbar myofascial pain syndrome"; "[t]horacolumbar radiculitis"; "discogenic syndrome"; "history of

---

[5] The medical records that are available do not indicate whether Plaintiff had additional surgery during this time frame.

herniated nucleus pulposus, right side at L4"; and "muscle spasm." Tr. at 464. Plaintiff received trigger point injections. Tr. at 465.

On August 30, 2005, Plaintiff saw Dr. Hanna for follow up. Tr. at 460. Plaintiff was doing "well" overall. Tr. at 460. Plaintiff complained of "some mid thoracic pain with radiation to the right side." Tr. at 460. Dr. Hanna also indicated Plaintiff had "previous thoracolumbar pain as well as discogenic syndrome and lumbar HNP." Tr. at 460. Dr. Hanna stated Plaintiff suffered from "[t]horacolumbar myofascial pain syndrome"; "discogenic syndrome"; "Lumbar HNP"; and "muscle spasm." Tr. at 460. Dr. Hanna performed two trigger point injections. Tr. at 460. The plan was for Plaintiff to receive trigger point injections and to obtain an MRI of the thoracic spine. Tr. at 460.

On September 30, 2005, an MRI of the thoracic spine showed that the "kyphotic curvature" appeared normal. Tr. at 415. There were no "bulging or herniated discs" in the thoracic spine. Tr. at 415. "No other extradural, intradural, extramedullary or intramedullary abnormalities [were] evident" in the thoracic spine. Tr. at 415.

On January 3, 2006, Plaintiff saw Dr. Hanna for his back, leg, and arm pain. Tr. at 454. Dr. Hanna determined Plaintiff suffered from "lumbar myofascial pain" and "thoracic or lumbrosacral neuritis or radiculitis." Tr. at 455 (capitalization omitted). Dr. Hanna recommended trigger point injections and continuation of Plaintiff's medication regimen. Tr. at 454-55. A Botox injection was also to be considered. Tr. at 454-55. Plaintiff was continued on temporary total disability. Tr. at 455. On February 6, 2006, Plaintiff returned to Dr. Hanna. Tr. at 452. Dr. Hanna recommended continuing the drug regimen and trigger point injections. Tr. at 452-53.

On May 31, 2006, Plaintiff saw Dr. Hanna again for his back condition. Tr. at 559. Plaintiff's condition was basically unchanged. Tr. at 559. Trigger point injections were recommended. Tr. at 559-60. On July 28, 2006, Dr. Hanna noted that a previous Botox injection had provided some relief, although the relief was only temporary. Tr. at 555. Dr. Hanna continued Plaintiff's medication and recommended trigger point injections. Tr. at 555-56. On December 28, 2006, Dr. Hanna noted Plaintiff's condition was unchanged. Tr. at 599. Plaintiff reported that some of his medications were helping; however, Plaintiff's pain scale was still seven out of ten. Tr. at 599. Trigger point injections were again recommended. Tr. at 600. Plaintiff was taking the following medication at that time: paroxetine, Gabapentine, Tramadole, Propoxyphen, mobic, ambien, provigil, quinapril, lasix, phenegran, glucosimin, and omperazol. Tr. at 599. Dr. Hanna indicated that Plaintiff had had side effects with the medication, such as nausea. Tr. at 599. This treatment was continued on January 16, 2007. Tr. at 600-01.

Dr. Gruber and Dr. Hanna completed physical assessment forms. On September 17, 2004, a form was submitted to Dr. Gruber, which he completed on December 21, 2004. Tr. at 484. On the form, Dr. Gruber indicated that Plaintiff was not capable of work and would be disabled for at least twelve months. Tr. at 484. It appears that a similar form was submitted to Dr. Hanna on March 8, 2005; on June 7, 2005, he indicated on the form that Plaintiff was not capable of employment, and that he would remain disabled for at least twelve months. Tr. at 462. A similar form was submitted to Dr. Hanna in November of 2005, on which it was indicated that Plaintiff was not capable of employment, and that he would remain disabled for at least twelve months. Tr. at 457, 574. On April 5, 2006, Dr. Hanna

submitted a form indicating that Plaintiff could carry up to twenty pounds; that Plaintiff could stand or walk one-half hour in an eight-hour day; and that Plaintiff could sit one-half hour in an eight-hour day. Tr. at 447-48. On August 25, 2006, Dr. Hanna indicated that Plaintiff met listing 1.04. Tr. at 567. There are also work release forms from Florida Spine Institute indicating temporary total disability from 2001 through 2006. Tr. at 568-97.

### 3. Plaintiff's Elbow and Wrist

On July 5, 2001, Plaintiff complained to Dr. Christ of problems with his left elbow. Tr. at 305. Plaintiff told Dr. Christ that he had hit his elbow approximately one year prior and had reinjured it six months prior to his July 5, 2001 visit. Tr. at 305. An X-ray revealed "mild olecranon spur but no evidence of fracture or dislocation." Tr. at 305. Dr. Christ recommended trying conservative treatment before resorting to surgery. Tr. at 305. Dr. Christ gave Plaintiff an injection of Dexamethasone and Xylocaine in the spur area. Tr. at 306. On July 26, 2001, Plaintiff reported that the injection helped "tremendously." Tr. at 304. Dr. Christ recommended keeping pressure off of the elbow and using heat, ice, and anti-inflammatory cream. Tr. at 304. Plaintiff was to continue using Celebrex. Tr. at 304.

On January 27, 2004, Dr. Hanna injected Plaintiff's wrist with Xylocaine. Tr. at 493. On August 11, 2004, Plaintiff saw Richard T. Herrick, M.D. ("Dr. Herrick") about a mass in Plaintiff's palm and wrist. Tr. at 407. Plaintiff explained that in 1997, his palm and finger had been initially injured in an accident involving a sledgehammer; four months prior to the August 11, 2004 visit, Plaintiff reported that he had fallen and reinjured his wrist. Tr. at 407. X-rays of Plaintiff's hands showed "no significant abnormalities." Tr. at 407. Dr. Herrick opined that Plaintiff had "[r]ight FCR tendinitis and long finger flexor synovitis with possible

ganglion and/or scar at the A1 pulley." Tr. at 406. Dr. Herrick recommended starting with conservative treatment. Tr. at 406. Dr. Herrick also suggested "a bicycle glove to protect the palm, and to add the splint back to this if necessary for the wrist." Tr. at 406.

On September 24, 2004, Plaintiff returned to Dr. Herrick and reported that there had been very little improvement in his wrist and finger. Tr. at 405. Dr. Herrick recommended continuing with the same medications (Bextra, Neutontin, tramadol, Darvocet, glucosamine with chondroitin, paroxetine, Prilosec, Accupril, and Thera-Gesic), and Plaintiff was to have an MRI taken of his wrist and hand. Tr. at 405.

The MRI was taken on November 9, 2004, and there was "a small focus of abnormal signal present in the volar aspect of the lunate bone characterized by an irregular area of increased T2, decreased T1 signal and enhancement." Tr. at 404. The MRI indicated a "[s]mall 8.0 mm mass with fluid characteristics present in the subcutaneous tissues with radial aspect of the distal shaft of the second metacarpal, which may represent a small subcutaneous cyst, or ganglion." Tr. at 403.

On November 24, 2004, Plaintiff saw Dr. Herrick and reported he was still having pain in his wrist and fingers. Tr. at 402. After reviewing the MRI, Dr. Herrick fit Plaintiff with "an aluminum splint for the dorsal aspect of the ring finger." Tr. at 402. Plaintiff was to "start an intensive therapy program including iontophoresis." Tr. at 402. Plaintiff was also given prescriptions for a liniment. Tr. at 402.

On January 28, 2005, Plaintiff returned to Dr. Herrick and reported he had had no real improvement. Tr. at 399. Dr. Herrick scheduled Plaintiff for surgery on his right hand. Tr. at 400. On May 11, 2005, Dr. Herrick performed "[r]ight long trigger release and right FCR

(flexor carpi radialis) tendon release" on Plaintiff. Tr. at 398. At the May 27, 2005 follow up appointment, Plaintiff was doing "relatively well." Tr. at 397. Plaintiff was to resume therapy on the wrist and finger one month later. Tr. at 397.

On August 31, 2005, Plaintiff returned to Dr. Herrick. Tr. at 393. There was some "[m]ild swelling" in Plaintiff's finger with "deconditioning in the right upper extremity." Tr. at 393. Plaintiff was given samples of some other pharmaceutical drugs and directed to start using a "gripper" several times a day. Tr. at 393. Dr. Herrick did not place any restrictions on what Plaintiff could do with his right hand. Tr. at 394.

On February 13, 2006, Dr. Shah referred Plaintiff to have radiographs of his right elbow and forearm. Tr. at 609-10. The radiographs revealed "spurring along the posterior margin of the joint space medially" and "osteophyte formation along the trochlea and coronoid process." Tr. at 609. Osteoarthritis was identified "along the capitellum laterally and also along the medial margin of the joint space along the trochlea." Tr. at 609.

### 4. Plaintiff's Depression

On May 3, 2001, Donald R. Taylor, Jr., M.D. ("Dr. Taylor") conducted a Forensic Psychiatric Evaluation of Plaintiff. Tr. at 178. Plaintiff had been referred to Dr. Taylor for the purpose of determining whether Plaintiff's mental condition was related to his accidents at work. Tr. at 178. Plaintiff denied any history of mental health problems prior to his injury in 1999. Tr. at 182. Plaintiff told Dr. Taylor he became upset because he felt like he was getting no help for his knee and abdominal pain, and he felt that the doctors were not being honest about his condition. Tr. at 182.

Dr. Taylor diagnosed Plaintiff with "Adjustment Disorder with Depressed Mood, Chronic Pain Disorder Associated with Psychological Factors and a Medical Condition, Chronic." Tr. at 185. Dr. Taylor opined that Plaintiff's "mood irritability is primarily related to his physical complaints." Tr. at 185. Dr. Taylor stated that Plaintiff's "psychiatric symptoms are not so severe that they would prevent him from returning to work or a vocational retraining program which could accommodate his physical limitations and restrictions." Tr. at 186.

On March 22, 2004, Peter M. Bursten, Ph.D. ("Dr. Bursten") conducted a psychological evaluation of Plaintiff. Tr. at 282-84. Plaintiff had been referred to Dr. Bursten by the Office of Disability Determinations. Tr. at 282. Dr. Bursten found Plaintiff to be oriented, thinking logically, and able to understand commands and follow directions. Tr. at 283. "He did not display inattention or distractibility." Tr. at 283. Dr. Bursten opined that Plaintiff had "experienced chronic emotional dissatisfaction/unhappiness that is associated with chronic pain and medical complications," which had "transitioned into a mild, yet persistent quality depression." Tr. at 284. Dr. Bursten diagnosed Plaintiff with "Dysthymic Disorder" and recommended "supportive counseling in conjunction with stabilization on appropriate antidepressant medication." Tr. at 284.

On April 26, 2005, Stephen J. Szabo, M.D. ("Dr. Szabo") conducted a psychiatric evaluation of Plaintiff. Tr. at 389. It appears the evaluation was conducted for litigation purposes. Tr. at 389. Plaintiff was oriented. Tr. at 391. His "[j]udgment was considered to be adequate and competent and he had some insight into his situation." Tr. at 391. Dr. Szabo diagnosed Plaintiff with "Major Depressive Disorder, Moderate Severity, Non-

Psychotic Type." Tr. at 391. Dr. Szabo recommended that Plaintiff diet and try a different anti-depressant. Tr. at 392. Plaintiff returned to Dr. Szabo on May 25, 2005, July 5, 2005, August 29, 2005, October 24, 2005, December 19, 2005, February 7, 2006, May 3, 2006, August 7, 2006, and October 30, 2006. Tr. at 618-26. On August 7, 2006, Dr. Szabo noted that Plaintiff "is not disabled psychiatrically." Tr. at 625.

### B. Testimony at Hearing

At the hearing before the ALJ on January 17, 2007, Plaintiff testified that problems with his back, knees, bladder, acid reflux, wrist, elbow, and arm prevent him from working. Tr. at 655-59. In addition, Plaintiff stated he suffers from depression and is taking Paxil, Ambien, and Provigil. Tr. at 658. Plaintiff indicated he suffers from side effects of his medications, including acid reflux, dizziness, nausea, lightheadedness, fatigue, and loss of concentration. Tr. at 662.

Plaintiff testified that he suffers from "crippling" pain at times. Tr. at 664-65. Plaintiff stated that he has sharp, throbbing pain in his back all the time, and that the pain in his knee is chronic. Tr. at 665. Plaintiff also stated that his "short term memory is not that good anymore," that he tends to "cry a lot," and that he does not socialize. Tr. at 667. Plaintiff reported difficulty sleeping, as well. Tr. at 668.

Plaintiff testified that he drives "a couple" of times a week into town to do shopping or see friends. Tr. at 649. Plaintiff indicated that he is able to cook "TV dinner like type of things," but not "elaborate meals." Tr. at 668. Plaintiff stated he is able to go grocery shopping, vacuum "a little bit," and do "small loads" of laundry. Tr. at 669. Plaintiff testified he does not do any yard work. Tr. at 669. Plaintiff explained that his sister helps with

cleaning and yardwork. Tr. at 669. Plaintiff stated that is able to drive forty minutes in one stretch, but that he has not driven in "a while." Tr. at 670. Plaintiff testified that he sometimes uses canes around the house, and that he has fallen "many times." Tr. at 671. Plaintiff stated that he goes to church "sometimes." Tr. at 672. Plaintiff indicated that he is no longer able to engage in his favorite activities: working on cars, playing baseball, and boxing. Tr. at 672. Plaintiff testified that he stays in bed all day "some days." Tr. at 673.

### C. The ALJ's Decision

When determining whether an individual is disabled, an ALJ must follow the five-step sequential inquiry described in the Code of Federal Regulations, determining as appropriate whether the plaintiff: 1) is currently employed; 2) has a severe impairment; 3) has an impairment that meets or medically equals one listed in the regulations; 4) can perform past relevant work; and 5) retains the ability to perform any work in the national economy. See 20 C.F.R. §§ 404.1520, 416.920; see also Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004).

After assessing Plaintiff's file, testimony, and medical and psychological history, the ALJ determined Plaintiff suffers from degenerative joint disease of his lumbar spine and degenerative joint disease of his knees, which are "severe" under 20 C.F.R. §§ 404.1520(c), 416.920(c). Tr. at 32. However, the ALJ determined that Plaintiff's impairments do not meet or medically equal any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. Tr. at 32. The ALJ found Plaintiff could stand and walk two hours in an eight-hour workday, sit six hours in an eight-hour workday, and lift ten pounds. Tr. at 32. The ALJ noted Plaintiff has occasional postural limitations with climbing, balancing, stooping, kneeling,

crouching, and crawling.  Tr. at 32.  The ALJ determined Plaintiff has the residual functional capacity to perform substantially all of the full range of sedentary work.  Tr. at 33.  The ALJ reached this conclusion in part by relying on the opinions of nontreating agency physicians, who opined Plaintiff could sit, stand, and/or walk six hours in an eight-hour workday.  Tr. at 29, 274-81, 369-76.  The ALJ also indicated that Plaintiff's "capacity for sedentary work is substantially intact and has not been compromised by any nonexertional limitations," such as Plaintiff's depression.  Tr. at 33.  Based on the Plaintiff's exertional capacity, age, education, and work experience, the ALJ concluded Plaintiff is not disabled under the medical-vocational guidelines at Rule 201.21, 201.22, and Rule 201.28, Appendix 2, Subpart P, and Regulation No. 4.  Tr. at 33.

### III.  Standard of Review

This Court reviews the Commissioner's final decision as to disability pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  While no deference is given to the ALJ's conclusions of law, findings of fact "are conclusive if . . . supported by 'substantial evidence' . . . ."  Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998)).  It is not for this Court to reweigh the evidence; rather, the entire record is to be scrutinized to determine whether "the decision reached is reasonable and supported by substantial evidence."  Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991) (internal quotation and citations omitted); see also McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'"  Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir.

1987)).  The substantial evidence standard is met when there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Falge, 150 F.3d at 1322 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  The decision reached by the Commissioner must be affirmed if it is supported by substantial evidence–even if the evidence preponderates against the Commissioner's findings.  Crawford v. Commissioner of Social Security, 363 F.3d 1155, 1158-59 (11th Cir. 2004).

## IV.  Discussion

Plaintiff challenges the ALJ's decision on three grounds.  First, Plaintiff contends the ALJ failed to consider the limiting effects of Plaintiff's mental impairment in determining Plaintiff's Residual Functional Capacity ("RFC").  See Pl.'s Mem. at 2, 5.  Second, Plaintiff asserts the ALJ improperly discredited Plaintiff's subjective testimony and failed to account for Plaintiff's longitudinal history with respect to his pain and the side effects of his medication.  See id. at 5-6.  Third, Plaintiff argues that the ALJ improperly discounted the opinions of Plaintiff's treating physicians.  See id. at 10, 13.  These issues are addressed in turn.

### A.  Limiting Effects of Plaintiff's Mental Impairment

The effects of a claimant's non-severe impairments must be taken into account when determining the claimant's RFC.  See 20 C.F.R. §§ 404.1523 and 416.923; see also Walker v. Bowen, 826 F.2d 996, 1001 (11th Cir. 1987) (stating that "the ALJ must consider the combined effects of a claimant's impairments in determining whether she is disabled," and that a claimant's combination of impairments may lead to a finding of disability "even though none of the impairments, considered individually, is disabling") (citing Jones v. Bowen, 810

F.2d 1001, 1005-06 (11th Cir. 1986); Bowen v. Heckler, 748 F.2d 629, 635 (11th Cir. 1984)). "In such instances, it is the duty of the [ALJ] to make specific and well-articulated findings as to the effect of the combination of impairments and to decide whether the combined impairments cause the claimant to be disabled." Heckler, 748 F.2d at 635.

The ALJ explicitly recognized the requirement that he consider "all medically determinable impairments" in the sequential evaluation process. Tr. at 22. In evaluating the evidence of record, the ALJ specifically reviewed the psychiatric evaluations by Dr. Taylor in May of 2001, observing his diagnosis was "adjustment disorder with depressed mood, chronic and pain disorder associated with psychological factors and a medical condition," and that Dr. Taylor assessed Plaintiff with a global assessment of functioning ("GAF") score of 65. Tr. at 23. The ALJ recognized that Dr. Bursten conducted a psychological evaluation of Plaintiff in March of 2004, and that Dr. Bursten found Plaintiff was experiencing "chronic emotional dissatisfaction that was associated with chronic pain and medical complications which transitioned in to a mild, yet persistent quality of depression." Tr. at 23-24. Moreover, the ALJ also recognized that on August 7, 2006, Dr. Szabo noted that Plaintiff was not disabled psychiatrically. Tr. at 25, 625. After reviewing Plaintiff's mental health records, the ALJ stated that Plaintiff's "subjective complaints and symptoms, including his allegations of pain and limitations, as well as depression, have been carefully compared to the other evidence." Tr. at 30. The ALJ further found that Plaintiff's "capacity for sedentary work is intact and has not been compromised by any nonexertional limitations." Tr. at 33.

Plaintiff argues that the GAF score of 38 given to him by Dr. Szabo on April 26, 2005, Tr. at 391, indicates a severe impairment that the ALJ failed to take into account. See Pl.'s

Mem. at 13-14; Tr. at 391. "The [GAF] Scale describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations." Mathis v. Astrue, No. 3:06-cv-816-J-MCR, 2008 WL 876955, at *7, n. 4 (M.D. Fla. Mar. 27, 2008) (unpublished) (citing Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") (4th ed. 1994) at 32). The GAF score is necessarily "a subjective determination that represents the clinician's judgment of the individual's overall level of functioning." Deboard v. Comm'r of Soc. Sec., No. 05-6854, 211 F. App'x 411, 415-16 (6th Cir. 2006) (unpublished) (internal quotation omitted). Although GAF scores frequently have been cited in Social Security disability benefits determinations, "the Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" Wind v. Barnhart, 133 Fed. App'x 684, 692 n.5 (11th Cir. 2005) (unpublished) (quoting Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 FR 50746-01, 2001 WL 1173632 (Aug. 21, 2000)); see also Parsons v. Astrue, No. 5:06cv217/RS-EMT, 2008 WL 539060, at *7 (N.D. Fla. Feb. 22, 2008) (unpublished) (noting same).

As a result of the Commissioner's refusal to endorse the GAF scale, and due to the subjectivity of the clinician's determination involved in assigning the GAF score, courts appropriately assign GAF scores limited weight in reviewing an ALJ's determination regarding a plaintiff's functional capacity. Indeed, as noted by a court in this district, "[r]eliance upon a GAF score is of questionable value in determining an individual's mental functional capacity." Gasaway v. Astrue, No. 8:06-cv-1869-T-TGW, 2008 WL 585113, at *4 (M.D. Fla.

Mar. 3, 2008) (unpublished) (citing Deboard, 211 F. App'x at 415-16). Although the ALJ did not specifically mention the GAF score of 38 assigned by Dr. Szabo on April 26, 2005, the ALJ explicitly took into account the April 26, 2005 examination. Tr. at 25. The ALJ also recognized that on August 7, 2006, Dr. Szabo noted Plaintiff was not psychiatrically disabled. Tr. at 25, 625. Given the questionable reliability of this GAF score when viewed with the other evidence of record, the ALJ's decision with respect to Plaintiff's mental impairment was supported by substantial evidence even though he did not specifically mention Plaintiff's April 26, 2005 GAF score.

Although it appears Plaintiff did suffer from depression beginning in 2001, Tr. at 185, substantial evidence supports the ALJ's finding that Plaintiff's mental impairment did not significantly impact his RFC. None of the physicians who examined Plaintiff's mental health indicated he suffered from a psychological or psychiatric condition that would limit his ability to work. Plaintiff's depression did not result in a diminished ability to concentrate or to understand and follow directions. The ALJ did not err in finding that Plaintiff's mental impairment does not reduce his ability to engage in substantial gainful activity.

### B. Plaintiff's Pain Testimony

"In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991)). "The claimant's subjective

testimony supported by medical evidence that satisfies the standard is itself sufficient to support a finding of disability." Holt, 921 F.3d at 1223. Although "credibility determinations are the province of the ALJ," Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005), "explicit and adequate reasons" must be articulated if the ALJ discredits the claimant's testimony. Wilson, 284 F.3d at 1225; see also Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005); Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992) (stating that "after considering a claimant's complaints of pain [or other subjective symptoms], the ALJ may reject them as not creditable, and that determination will be reviewed for substantial evidence"). "When evaluating a claimant's subjective symptoms, the ALJ must consider such things as: (1) the claimant's daily activities; (2) the nature, location, onset, duration, frequency, radiation, and intensity of pain and other symptoms; (3) precipitating and aggravating factors; (4) adverse side-effects of medications, and (5) treatment or measures taken by the claimant for relief of symptoms." Davis v. Astrue, 287 F.App'x 748, 760 (11th Cir. 2008) (unpublished) (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vi)); see also 20 C.F.R. § 416.929(c)(3)(i)-(vi) (providing the same).

The ALJ found Plaintiff's "allegations and subjective symptoms beyond what could be expected considering the objective laboratory and clinical findings." Tr. at 30. In other words, the ALJ found that Plaintiff's objectively determined medical conditions could not have been reasonably expected to give rise to his claimed pain. This finding is not supported by substantial evidence. Plaintiff had pain emanating from "the chondromalacia of the patella and in the parapatellar area," Tr. at 299, and he had moderate degenerative arthritis in his knees. Tr. at 288. Plaintiff underwent arthroscopic surgery for his left knee twice. Tr. at 313-

14, 332-33. Plaintiff also had pain in his right knee. Tr. at 286. He regularly received injections in his knees for the pain he was experiencing. Tr. at 285, 288, 297, 302, 307, 308. With respect to his back, Plaintiff suffered from "[t]horacolumbar myofascial pain syndrome," "discogenic syndrome," "Lumbar HNP," "muscle spasm," "thoracic myofascial pain," and "thoracic lumbosacral neutritis or radiculitis." Tr. at 460, 600 (capitalization omitted). He underwent percutaneous diskectomy surgery for his back. Tr. at 494-95. He received various injections for his back. Tr. at 536-38, 460, 499-500. He was on a battery of pharmaceutical drugs to help him cope with the pain. Tr. at 415, 464, 599-600. It is clear that Plaintiff's objectively determined medical conditions could reasonably have been expected to cause the pain he reported experiencing.

In discrediting Plaintiff's testimony with respect to his pain, the ALJ also made reference to Plaintiff's "lifestyle," finding that Plaintiff could clean, vacuum, prepare his own meals, do his own laundry, attend church, drive to his sister's house forty miles away, and lift twenty pounds. Tr. at 30. In making this finding, the ALJ referred to "Reports in Section E." Section E includes the report of a third party, Edwin Quintana, who stated that Plaintiff does "limited" household chores, Tr. at 132, and is able to make sandwiches, tv dinners, and "simple" meals, Tr. at 134. Mr. Quintana stated Plaintiff is able to do "some" cleaning, laundry, and ironing; that is, "simple work." Tr. at 134. Mr. Quintana indicated that Plaintiff goes outside "as often as needed for food," and that he shops twenty to forty-five minutes at a time. Tr. at 135. Mr. Quintana also indicated that Plaintiff has difficulty dressing and bathing because of his medical condition; in particular, Plaintiff has difficulty washing his feet. Tr. at 133.

At the hearing, Plaintiff testified that he does not make "elaborate" meals. Tr. at 668. Plaintiff reported that he is able to do only "a little bit" of household chores, adding that his home was a "mess" and "pretty bad." Tr. at 669. Plaintiff stated that he is able to drive only forty minutes at a time, and that he has not driven in "a while." Tr. at 670. Plaintiff also stated that his medications affect his ability to drive. Tr. at 647. Plaintiff indicated that he goes to church "sometimes," and that he is no longer able to engage in his favorite hobbies. Tr. at 672.

It was proper for the ALJ to consider Plaintiff's daily activities when evaluating his subjective symptoms in determining Plaintiff's RFC. See Davis, 287 Fed. App'x at 760 (citing 20 C.F.R. § 404.1529(c)(3)(i)-(iv)). However, participation in everyday activities of short duration, such as light housework, do not disqualify a claimant from disability. See Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997); see also Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (finding a claimant was not disqualified from disability when her activities of daily living were comprised of lifting and carrying objects up to ten pounds, performing light household chores, including cooking, driving and shopping for needed household items, walking around the mobile home park where she lived for exercise, and caring for her own needs, including bathing, feeding, and dressing). Plaintiff's activities here are similar to those that the United States Court of Appeals for the Eleventh Circuit has determined are not necessarily indicative of an ability to work.

In addition, the ALJ did not address the alleged side effects of the medications that Plaintiff is taking. There is at least some evidence in the record indicating that Plaintiff suffers

from side effects. Tr. at 599. On remand, the ALJ should address the side effects of the medication Plaintiff is taking with respect to his RFC.

The ALJ's decision to discount Plaintiff's subjective testimony as to pain is not supported by substantial evidence. On remand, the ALJ should reconsider whether Plaintiff's objectively determined medical condition could reasonably be expected to produce the symptoms of pain of which Plaintiff complains. If the ALJ decides to discredit Plaintiff's testimony, he should provide explicit and adequate reasons for doing so. The ALJ should also assess the side effects of Plaintiff's medication.

### C. Treating Physicians

The Social Security Administration has promulgated regulations instructing ALJs how to weigh the medical opinions[6] of treating physicians[7] properly. See 20 C.F.R. § 404.1527(d). Because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)," a treating physician's medical opinion is to be afforded controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2). When a treating physician's medical opinion is not due controlling weight, the ALJ must determine the appropriate weight

---

[6] Medical opinions are statements from physicians that reflect judgments about the nature and severity of the claimant's impairment, including symptoms, diagnosis, prognosis, and what the claimant can still do despite the impairment. 20 C.F.R. § 404.1527(a)(2).

[7] A treating physician is a physician who provides medical treatment or evaluation to the claimant and who has, or has had, an ongoing treatment relationship with the claimant, as established by medical evidence showing that the claimant sees or has seen the physician with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required the for the medical condition. See 20 C.F.R. § 404.1502.

it should be given by considering factors such as the length of treatment, the frequency of examination, the nature and extent of the treatment relationship, as well as the supportability of the opinion, its consistency with the other evidence, and the specialization of the physician. Id.

If an ALJ concludes the medical opinion of a treating physician should be given less than substantial or considerable weight, he or she must clearly articulate reasons showing "good cause" for discounting it.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  Good cause exists when (1) the opinion is not bolstered by the evidence, (2) the evidence supports a contrary finding, or (3) the opinion is conclusory or inconsistent with the treating physician's own medical records.  Phillips v. Barnhart, 357 F.3d 1232, 1240-41 (11th Cir. 2004); see also Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991); Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987) (stating that a treating physician's medical opinion may be discounted when it is not accompanied by objective medical evidence).  The ALJ must "state with particularity the weight he [or she] gave the different medical opinions and the reasons therefor."  Sharfarz v. Bowen, 825 F.2d 278, 279-80 (11th Cir. 1987); see also MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).

The ALJ gave "no weight" to Dr. Hanna's opinion that Plaintiff met listing 1.04 in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Plaintiff does not take issue with the ALJ's finding in that regard.  See Pl.'s Mem. at 10-14.  Plaintiff does argue, however, that the ALJ improperly discounted Dr. Hanna's opinion that Plaintiff could only stand, walk, or sit one-half hour at a time.  Pl.'s Mem. at 12; Tr at 447-48.  The ALJ explained that Dr. Hanna's opinion was "quite extreme and not supported by objective medical evidence."  Tr. at 29.  It is not

entirely clear what amount of weight the ALJ gave this aspect of Dr. Hanna's opinion, but it appears the ALJ gave it no weight. Tr. at 29.

The ALJ articulated the following reasons for rejecting Dr. Hanna's opinion that Plaintiff could only stand, walk, and sit for one-half hour at a time. The ALJ explained that Plaintiff had no impairments in his upper extremities, no muscle weakness, and normal gait. Tr. at 29. The ALJ relied on Dr. Christ's statements that Plaintiff should be limited to sedentary work. Tr. at 29-30. The ALJ noted that Dr. Herrick did not put any restrictions on Plaintiff's use of his right hand, Tr. at 394, and the ALJ pointed out that no surgery was needed for his hands. Tr. at 29. The ALJ also relied on the opinions of two nontreating agency physicians, who opined Plaintiff could sit, stand, and/or walk six hours in an eight-hour workday. Tr. at 29, 274-81, 369-76. The ALJ further observed that Plaintiff reported his medications were helpful, and that progress notes from Florida Spine Institute indicated Plaintiff was "functional and mentally and physically stable." Tr. at 29-30. The ALJ determined, "based upon the overall objective medical evidence[,] the opinions of the physicians at the Florida Spine Institute that he is disabled are not supported." Tr. at 29-30.

The ALJ's reasons for rejecting Dr. Hanna's opinion that Plaintiff could only stand, walk, and sit for one-half hour at a time contradict the medical evidence and established law in at least five respects. First, the ALJ relied on the opinions of nontreating physicians to discount the opinion of Dr. Hanna, a treating physician. Tr. at 29. The contrary opinion of a nontreating physician does not in and of itself establish good cause to discount a treating physician's opinion. See Lewis, 125 F.3d at 1440-41; 20 C.F.R. § 404.1527(d)(2).

Second, the ALJ's finding that Plaintiff had normal gait contradicts the medical evidence. Dr. Christ consistently observed that Plaintiff had a "guarded type gait." Tr. at 292, 293, 294, 298, 301, 302.

Third, the ALJ apparently relied on Dr. Christ's statement that Plaintiff "does have the same long term limitations with sedentary work only with limited walking and standing and he will not tolerate stairs or kneeling." Tr. at 309. Putting the ambiguity of that statement aside, it is not inconsistent with Dr. Hanna's opinion, and it provides no support for the ALJ's ultimate conclusion that Plaintiff was able to perform substantially all of the exertional and nonexertional functions required at the sedentary level. The statement was made on February 27, 2001, Tr. at 309, relatively early in the course of Plaintiff's treatment. Plaintiff's degenerative knee condition appears to have worsened to the point that he was considering further surgery in 2004. Tr. at 285-86. Moreover, Dr. Christ treated Plaintiff's knee condition, while Dr. Hanna at Florida Spine Institute was treating Plaintiff's back problems. Tr. at 309. Dr. Christ's assessment was related to Plaintiff's knees; Dr. Hanna's assessment was related to Plaintiff's back.

Fourth, one cannot assume that by using the word "sedentary" Dr. Christ intended to convey the meaning that the Social Security Administration gives the term "sedentary work." See 20 C.F.R. §§ 404.1567 and 416.967; cf. Hall v. Harris, 658 F.2d 260, 265-66 (4th Cir. 1981) (explaining there was nothing to suggest a doctor's use of the term "light work" was equivalent to the definition of light work in the regulations). There is no indication Dr. Christ was of the opinion that Plaintiff was able to stand and walk two hours in an eight-hour workday and sit six hours in an eight-hour workday. Similarly, Dr. Christ's statements that

Plaintiff "does need vocational training," Tr. at 303, and that Plaintiff would "benefit from retraining into some type of position where he was not on his feet so much," Tr. at 380, do not translate to an opinion that Plaintiff was able to perform a full range of sedentary work. Dr. Christ's assessment is not necessarily inconsistent with Dr. Hanna's assessment.

Fifth, there is evidence in the record supporting Dr. Hanna's opinion, which the ALJ did not address when discounting Dr. Hanna's opinion that Plaintiff could stand, walk, and sit only one-half hour at a time. Tr. at 29. Plaintiff had two surgeries on his knee, Tr. at 313-14, 332-34, and one surgery on his back, Tr. at 494. Plaintiff was receiving injections and taking numerous medications for his pain. Tr. at 285-87, 292-97, 308, 309, 312, 380, 452-53, 460, 465, 518, 520-22, 500, 523, 527, 531, 536-38, 554, 599-601. Plaintiff frequently sought medical treatment for his knee and back pain over a period of years. Although the ALJ stated that the "overall objective medical evidence" did not support the opinions of the physicians at Florida Spine Institute, a large part of the medical evidence actually came from the physicians at Florida Spine Institute, like Dr. Hanna, who were treating Plaintiff for his back problems. Although Plaintiff did report on at least one occasion that his medications did "help improve with his activities of daily living," the botox injection he received had provided only "temporary" relief, he reported a pain scale of seven out of ten, and he received additional injections. Tr. at 599-601.

The ALJ's reasons for discounting Dr. Hanna's opinion are not supported by substantial evidence. On remand, the ALJ should reweigh the opinions of Dr. Hanna and the other physicians at Florida Spine Institute. If the ALJ discounts the treating physicians' opinions, he should provide adequate reasons supported by substantial evidence.

## V. Conclusion

Substantial evidence supports the ALJ's treatment of Plaintiff's mental impairment. However, the ALJ did not provide adequate reasons for discrediting Plaintiff's pain testimony, and the ALJ's reasons for discounting the opinions of Plaintiff's treating physicians were not supported by substantial evidence.[8]  In accordance with the foregoing, it is

**RECOMMENDED:**

1.  That the Clerk of Court be directed to enter judgment pursuant to sentence four of 42 U.S.C. § 405(g) as incorporated by 42 U.S.C. § 1383(c)(3) **REVERSING** the Commissioner's decision and **REMANDING** this matter with the following instructions:

    (A)  Reconsider whether Plaintiff's objectively determined medical condition could reasonably be expected to produce the symptoms he alleges, and determine whether the side effects of his medications reduce his residual functional capacity.  If the ALJ decides to discredit Plaintiff's subjective testimony, explicit and adequate reasons should be provided; and

    (B)  State the weight given to Dr. Hanna's opinion that Plaintiff could stand, walk, or sit only one-half hour at a time.  If the ALJ decides to discount Dr. Hanna's opinion in this regard, or to discount the opinions of any

_____

[8]  It should also be noted that Plaintiff asserts that the ALJ erred in not posing questions to a vocational expert.  Because the ALJ determined that Plaintiff was able to perform substantially all of the full range of sedentary work, he was not required to utilize a vocational expert.  See Phillips v. Barnhart, 357 F.3d 1232, 1242 (11th Cir. 2004); Passopoulus v. Sullivan, 976 F.2d 642, 648 (11th Cir. 1992).  If on remand the ALJ determines that Plaintiff is unable to perform the full range of work at the given functional level, then the use of a vocational expert would be necessary.

other treating physicians, reasons showing good cause that are supported by substantial evidence should be articulated.

2.    That the Clerk of Court be directed to close the file.

**RESPECTFULLY RECOMMENDED** at Jacksonville, Florida this 5th day of August, 2009.

*James R. Klindt*

**JAMES R. KLINDT**
United States Magistrate Judge

jdf
Copies to:

Honorable Elizabeth A. Kovachevich
United States District Judge

Counsel of Record